Argued May 11, affirmed August 3, 1960

# WEYERHAEUSER TIMBER COMPANY *v.*
## STATE TAX COMMISSION
### 355 P. 2d 615

*Roger C. Henselman,* Tacoma, Washington, argued the cause for appellant. With him on the briefs were John R. Hay and Hart, Rockwood, Davies, Biggs and Strayer, Portland.

*Theodore de Looze,* Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Robert Y. Thornton, Attorney General, and John C. Mull, Assistant Attorney General, Salem.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

GOODWIN, J.

This is an appeal from a decree of the circuit court which denied relief to the plaintiff taxpayer under statutory proceedings to review an order of the defendants, commissioners of the Oregon State Tax Commission. The parties will be referred to as the taxpayer and the Commission.

The Commission on September 24, 1958, issued Opinion and Order No. VL-58-206-A, which required county assessors to make changes in the value of standing timber for *ad valorem* tax purposes in four Oregon counties. The order resulted in litigation in the counties of Coos, Douglas, and Lane, but not in Benton County. The litigation in Lane County was disposed of in the trial court. The litigation in Douglas County involved a different issue than that raised in Coos County, and it is considered in *Roseburg Lumber Co. v. State Tax Commission*, 223 Or 294, 355 P2d 606, decided this day.

The Commission order, insofar as it affected Coos County taxpayers, directed the county assessor to place all merchantable timber on the 1958 assessment roll at the "retail value" as determined by the Commission's valuation division but reduced by the use of a uniform deferment factor of 0.30 throughout the county to arrive at "wholesale value" for timber of various classes in various parts of the county.

For a discussion of the Commission order and the recitals therein, see *Roseburg Lumber Co. v. State Tax Commission*, supra.

This appeal requires an interpretation of the Commission's powers and duties under ORS 306.127 (2), which provides:

> "The appraised value of standing timber determined by the State Tax Commission or a county

assessor shall be by a method which *takes into consideration* the species, quality, volume after allowance for defect and breakage; accessibility to point of conversion; topography of the site and surrounding country; risk of loss due to fire, insects, disease and storms; growing conditions; carrying charges; and *total volume of timber in the area and its rate of depletion."* (We have emphasized the words that create the principal issue before us.)

The quoted section was enacted as Chapter 230, § 1, Oregon Laws of 1955. Prior to its enactment, the matters dealt with in the quoted statute had been studied, in and out of the legislature, by timber owners, economists, and tax experts. Certain effects of the above statute are considered in the related case of *Roseburg Lumber Co. v. State Tax Commission,* supra.

The inclusion of the provision concerning rate of depletion was obviously intended to be given some effect in assessing timber. The extent to which this particular provision is given effect becomes the principal question now before this court.

The taxpayer contends that the rate of depletion in "the area" means essentially the taxpayer's rate of depletion if the taxpayer operates on a large enough scale so that its rate of depletion is capable of calculation and realistic employment in the assessing process. The Commission contends that "area" as used by the legislature means an area no smaller than a county and that the preferred interpretation would include in a depletion "area" several counties having relatively similar forest resources and lumbering practices.

The importance of the meaning of "area" to the taxpayer becomes evident when it is observed from the testimony in the trial court that the taxpayer owns

3½ billion of the approximately 4 billion feet of standing timber in what are described as the Millicoma and Coos River watersheds in the northeast portion of the county. The taxpayer owns relatively smaller amounts of timber in the remainder of the county.

The taxpayer produced evidence tending to show that its timber, if cut at the same rate each year as was followed in 1958, would not be depleted in less than 40 years. There was evidence that in the southern part of the county the bulk of the timber is held by owners whose 1958 rate of harvest would, if continued, result in substantial depletion in something less than 14 years.

The depletion factor of 0.30 used by the Commission roughly accommodates a depletion rate or holding period of 30 years. Thus, the taxpayer claims, it is being penalized by a valuation factor which gives the *ad valorem* tax advantage to the timber owner who harvests his timber at an accelerated rate.

As described in *Roseburg Lumber Co. v. State Tax Commission,* supra, the depletion factor is a percentage figure applied to "retail" or market value of timber if it were to be sold for immediate cutting. This depletion factor is the percentage of the "retail value" of the timber to which the assessor may apply the county assessment ratio in arriving at the ultimate assessed value. Thus timber which might sell for $20 per thousand board feet, when reduced to "wholesale value" by the depletion factor of .30, becomes taxable on a basis of $6 per thousand board feet, not because it is worth only $6, but because it is in an area in which timber in large blocks is being held for future harvesting.

The owners of such timber are given a discount in recognition of the carrying charges, the risk of

loss, and the fact that the principal value in mature timberland can be realized by its owner only once, at the time of the timber's removal. Thus, while the reserves of private timber blocked and held by a taxpayer have a potential value if at any time the taxpayer should decide to put the timber on the market, such timber reserves are unlike other types of real property which have a continuing earning capacity in rentals or in the production of annual crops.

It has been suggested that the method of taxation of mature stands of fir timber being held for future cutting leaves much to be desired, and it may well be, as mentioned in the briefs, that the legislature and the Commission will continue to devise new methods and put them into practice with a view toward improvement in this troublesome field. Timber taxation, the record shows, is still far from an exact science.

Cogent arguments based on economic, social, and conservation considerations were made by the taxpayer in briefs and oral argument, as well as at the trial. These arguments tend to support its contention that the Commission should have adopted the depletion areas established by the county assessor and not objected to by the taxpayer. The assessor had divided the county into two major watershed operating "areas" based on an average depletion rate in the taxpayer's "area" of 42 years and an average depletion rate of 11 years in the southern "area".

The taxpayer contends that the order appealed from fails to give effect to a legislative mandate. It says that ORS 306.127 (2) requires a system of assessment which fully recognizes the taxpayer's own depletion rate whenever the taxpayer owns enough timber to constitute an operating area.

The taxpayer owns more than enough timber in Coos County to constitute an operating area. The testimony to that effect was uncontradicted. The taxpayer's own depletion practices, as of the time of trial, were shown to vary from 38 to more than 100 years, so that a 40-year depletion rate, urged by the taxpayer, would not be extravagant if depletion were the sole or controlling consideration.

The taxpayer asks us to reverse the trial court in two particulars. First, we are asked to hold as a matter of law that "area" as used in the quoted statute means an "operating area" or a combination of operating areas having similar depletion rates under contemplation at the time of the making up of the roll.

Next, we are urged to hold as a matter of law that the statute which requires the Commission to use a method which "takes into consideration" the rate of depletion really means that the Commission is required to employ a method of determining value which is substantially controlled by the rate of depletion.

The word "area", as used in the statute, is subject to interpretation. When an interpretation of this character is called for and is made by the Commission, the taxpayer assumes a difficult burden in asking a court to substitute its own interpretation.

It is appropriate to view the Commission order and the circuit court decree in the context of Article 1, § 32, Oregon Constitution:

> "No tax or duty shall be imposed without the consent of the people or their representatives in the Legislative Assembly; and all taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax."

The Commission and the courts are also bound by ORS 308.232 (1):

"All property, whether real or personal shall be assessed at its true cash value, or a percentage thereof, applied uniformly to all classes of property within each county, ending with the assessment date, January 1, 1960."

The taxpayer argues forcefully that there is little difficulty in harmonizing the above-quoted statute with the taxpayer's concept of "area" under ORS 306.127 (2). There is even less difficulty in harmonizing the above statute and the constitutional provision with the Commission's concept of "area". Uniformity has long been a legislative goal in tax laws.

Beginning with the quoted section of the Constitution, legislative history is replete with expressions of a policy to make property tax uniform throughout the state and within the counties. Chapter 218, Oregon Laws 1909, established the State Tax Commission and set uniformity as one of its objectives. The forerunner of ORS 306.090, Chapter 465, Oregon Laws 1929, adds to the powers of the Tax Commission increased regulatory authority over the county assessors, "* * * to the end that all taxable property in this state shall be listed upon the assessment rolls and valued and assessed according to the provisions of law, and equalized between all taxpayers and between the different counties of this state, and between the different taxing units, so that equality of taxation shall be secured according to the provisions of law."

The taxpayer failed to prove to the satisfaction of the trial judge, and the record equally fails to convince this court, that the Commission exceeded its authority under the tax statutes in applying a uniform depletion factor in Coos County, even though the re-

sult to a particular taxpayer may prove to be either beneficial or burdensome, depending on what the taxpayer may be planning to do with the property at some future time.

The statute now under consideration, ORS 306.127 (2), uses two equally ambiguous terms, "surrounding country" and "area", in describing factors the Commission is to "take into consideration." "Surrounding country" is not before the court; "area" is. The taxpayer may be correct in saying that "area" should be something less than a county, because the legislature could have said "county" instead of "area". It may equally well be urged that "area" can include more than one county. The record shows that the Commission had before it the knowledge that the taxpayer owns contiguous timber stretching across the county line and extending well into Douglas County.

Both parties have assembled a formidable array of cases from other jurisdictions in order to fortify their positions on the meaning of "area" in its present context. We find the cases interesting but of no substantial help.

Webster defines "area" in a multitude of contexts from architectural to surgical. Webster, New International Dictionary (2d ed Unabridged) 1934. The Latin word meant a broad piece of level ground. The context in which the word is used in the statute affords little guidance to the intended meaning.

If we assume for the purpose of construing the statute that "area" means something more or something less than a county, then we immediately enter a discretionary field. An "area" must be designated by some one; it is therefore logical to infer that the legislature left the determination to the Commission. Another alternative would have been to allow each

individual taxpayer, or each county assessor, to exercise this discretion. However, the statute is directed to the Commission "or a county assessor".

The taxpayer, being satisfied with the assessor's exercise of discretion in this case, contends for an interpretation of the word "area" consistent with his interpretation. The taxpayer does not go so far as to claim it has the right to designate its own holdings as an "area". It concedes that, to be workable, an "area", for the purposes mentioned, could include the ownerships of several taxpayers for administrative convenience, if the area is based on topography, logging practices, and a common depletion rate.

The difficulty in accepting the taxpayer's contention is that if another taxpayer, who follows a different depletion schedule, is involved in a common "area", the principle breaks down. For example, if the taxpayer's "area" includes only one other ownership, but the second owner is logging all his timber during the tax year, the second taxpayer would receive the benefit of the first taxpayer's depletion rate, which may be as much as 75 years.

According to the testimony of the county assessor, he would have preferred individual ownership areas if such a plan were administratively workable. He testified that by averaging the whole county to arrive at a single uniform depletion factor the result was "average inequality." He took the view in his preliminary planning that by dividing the county into seven depletion "areas" he could reduce the inequalities by a substantial margin, although he recognized that there would be adjacent owners even within smaller "areas" who would be following widely differing depletion practices. The assessor's decision to divide the county into two major watershed depletion areas was ad-

mittedly an administrative convenience which he thought would achieve approximate equality for more taxpayers than would a uniform depletion rate spread over the entire county.

That reasonable men can differ over the interpretation of the "area" concept in the statute is abundantly clear from reading the record. The Commission took the view that it was charged with the duty of accomplishing substantial equality, not only within each given county, but among the several counties. ORS 307.030. The Commission concluded that larger "areas" should be used, and its order with reference to other counties indicates that for 1958 no area smaller than a county was employed. In the case of Douglas County, where timber species and growth characteristics vary from the coastal slopes facing the Pacific Ocean to the sub-alpine species in the high Cascades and the mixed fir and pine in the Josephine County border area, a single depletion area was contemplated.

The testimony showed that it was only after weighing all the factors mentioned in the statute, and the practical difficulties in permitting each taxpayer to designate its own area, that the Commission decided to apply an average depletion factor to the timber in the entire county at a uniform rate. This was an exercise of discretion. The statute gave no apparent limits to this discretion.

■■ We hold that the interpretation of the word "area" was within the sound discretion of the Commission, and that its interpretation is not to be overturned unless it was clearly unreasonable. In *Knappton Towboat Co. v. Chambers,* 202 Or 618, 623, 276 P2d 425 (opinion corrected, 207 Or 702, 277 P2d 763), this

court quoted from *Weyerhaeuser Land Co. v. Board etc.*, 85 Or 434, 443, 165 P 1164:

"* * * To a large extent an assessment depends upon one's judgment. If the method by which the assessor arrived at the value of the property was correct and the assessment was in good faith fairly made, we are not permitted under the statute as we read it, to pit our judgment as to the value against that of the assessor, although other men of equal ability and fairness might differ in estimating the value of the property. * * *"

The language just quoted requires that the assessor use the proper method, but when the propriety of the method is the subject of the difference of opinion, the same rule applies.

"* * * Thus it is clear that a court, in order to set aside the figure of an assessment, must be able to say that an assessor or assessing body has arrived at a valuation which lies outside of and beyond an area where reasonable minds might differ as to the true cash value of the assessed property, or that the assessment was not fairly and in good faith made; that is, that there is not uniformity within the class being assessed." *Knappton Towboat Co. v. Chambers,* supra at 623, 624.

The taxpayer contends that in following the above-quoted principles, the trial judge accepted the Commission's assessments without regard to the method used by the Commission, but solely because the taxpayer had failed to prove that the assessed value in any event would have exceeded the true cash value of the property.

The trial court observed, as have we, that the statute, ORS 306.127 (2), enumerates at least nine factors to be taken into consideration. See *Roseburg Lumber Co. v. State Tax Commission,* supra. The statute

does not give controlling effect to any one of the enumerated factors. The ultimate assessed value must be the result of a consideration of the aggregate of this complex direction by the Legislative Assembly. The recitals in the Commission's order, as well as the testimony at the trial, make it clear that the Commission did take all the factors, including depletion, into account. In applying a uniform factor roughly equivalent to a 30-year depletion rate to all timber in the county, no taxpayer's timber was shown to be assessed at more than its true cash value. The fact that the method used may result in a tax advantage to some other taxpayer is no cause for relief. *Robinson et ux v. State Tax Com.*, 216 Or 532, 339 P2d 432.

The main thrust of the taxpayer's complaint is that those operators who are not conserving their timber for sustained-yield purposes are given a tax windfall and those who are operating on a sustained-yield program are in comparison being penalized for their thrift. The merits of this argument are better addressed to the legislature, which makes tax policy, than to the courts, which may merely review the actions of the Commission to redress manifest abuse of discretion in the event that such should be proven. There was no abuse of discretion.

If the legislature wants to require timber owners to file declarations of projected depletion plans, it can say so. A statute could make the declarations of projected depletion subject to review and recapture or refund if performance deviates from the depletion rate declared. This has not yet been done in the *ad valorem* tax field, but is common in the income tax field. Bills which might have accomplished such a result failed of passage in 1957. (HB 209 and 821, 1957). We do not hold such absence of legislation to

be proof of legislative intent, but take note of the bills to show that the matter has been given study in at least one session of the assembly.

A number of other important considerations were urged upon the court in the able briefs and arguments by the taxpayer, but we believe that the issue is determined by our holding that there was a failure of proof in the trial court that the Commission (1) abused its discretion in its application of the "area" concept to an entire county, or (2) abused its discretion in the degree to which it took into consideration the volume of timber in the area and its rate of depletion.

■ In exercising its judgment, the Commission was acting in a manner that is traditionally reserved to such administrative bodies. Courts may not substitute their judgment for the judgment of the Commission without a showing that there was a manifest abuse of discretion. Even the cases cited by the taxpayer, in which taxing authorities have been reversed, recognize this basic principle. See *Parsons v. Detroit & Canada Tunnel Co.*, (DC, Mich) 15 F Supp 986, 994.

If individual owners choose to take advantage of favorable tax considerations by following a practice of rapid depletion, it would be competent for the legislature to withhold the benefit of the depletion discount from taxpayers whose practices might make them ineligible under appropriate legislation. But in the absence of such enactment, uniformity within the county and within the class of property must be preserved. By way of illustration, if two landlords each own identical houses on adjoining lots, and one charges twice the rent charged by the other, that would be no justification for the county to assess the tax on the basis of the taxpayer's management decision.

Affirmed; neither party to recover costs.